UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

v.                                      Criminal Case No. 11-20704

D-1 Gerald Bass D-1 and
D-2 Rahim Berry,                    Honorable Sean F. Cox

      Defendants.
_____/

## OPINION & ORDER
## ON MOTIONS TO SUPPRESS
## FILED BY DEFENDANTS BERRY AND BASS

In this action, Defendants Rahim Berry ("Berry") and Gerald Bass ("Bass") are charged with committing identity theft and other financial crimes. This matter is currently before the Court on Motions to Suppress Evidence filed by Berry and Bass. The parties have briefed the issues and the Court held an evidentiary hearing on May 2, 2012.

The Court shall DENY Berry's Motion to Suppress because the cell phone at issue was properly seized incident to Berry's arrest.

In addition, for the reasons explained below, the Court shall GRANT IN PART AND DENY IN PART the Motions to Suppress filed by Bass. The Court shall GRANT the motions to the extent that the Court shall SUPPRESS the following evidence: 1) Bass's statement to the police that he had "less than a dime in the house"; and 2) the credit card (Hrg. Ex. No. 1), the drivers license (Hrg. Ex. No. 2), and certain other items that were seized during the execution of the search warrant on Ilene Street in Detroit, Michigan on November 2, 2011. The motions shall

be denied in all other respects.

## BACKGROUND

There are four Defendants charged in this action, including Defendants Berry and Bass. The Defendants are charged with committing identity fraud, identity theft, credit fraud, and other financial crimes. Berry and Bass are charged with the following counts: 1) Conspiracy, in violation of 18 U.S.C. § 1349 (Count 1); 2) Access Device Fraud, Aiding and Abetting, in violation of 18 U.S.C. §§1029(a)(2) and 2 (Count 2); and 3) Theft of Identity, Aiding and Abetting, in violation of 18 U.S.C. §§1028(a)(7) and 2 (Count 3). (Indictment, Docket Entry No. 16). In addition, Bass alone is charged with the following additional counts: Theft of Identity, Aiding and Abetting, in violation of 18 U.S.C. §§1028(a)(3) (Count 4); and Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A. (*Id.*).

### A.  Berry's Motion to Suppress

On March 1, 2012, Berry filed a motion seeking to suppress evidence. (Docket Entry No. 53). Berry asks the Court to suppress evidence seized from a Metro cell phone. Berry contends the Court should suppress that evidence because the cell phone at issue "was not on his person at the time of his arrest, nor in the immediate area to support its seizure much less a subsequent search of its content." (*Id*. at 8).

In response, the Government contends that the cell phone was properly seized incident to Berry's arrest, and subsequently searched pursuant to a valid search warrant. (Docket Entry No. 68).

### B.  Bass's Motions To Suppress

Bass filed four separate motions seeking to suppress evidence, Docket Entry Numbers

54, 58, 60 and 61.

### 1. Docket Entry No. 54

In Docket Entry No. 54, Bass contends that he was not advised of his *Miranda* rights upon his arrest. He contends he was not advised of his *Miranda* rights until after he was transported to the Detroit Field Office. Bass asks the Court to suppress any statements he made prior to being advised of his rights.

In response, the Government acknowledges that Bass was not read his *Miranda* rights "the moment that he was taken into custody, or while he was being transported to the Secret Service Office." (Govt.'s Br. at 2). However, the Government contends that Bass was advised of his rights before he was questioned and that he waived his rights, orally and in writing, before he answered the agents' questions. (*Id*.).

### 2. Docket Entry No. 61

In Docket Entry No. 61, Bass contends that he was actually arrested about four houses away from the residence and that the officers conducted an illegal warrantless search of his residence after arresting him.

In response, the Government contends that Bass was arrested at the residence, after he opened the door, and that the officers entered and did a brief security sweep. It further contends that Bass was not wearing shoes when he was arrested and that he asked the officers to get his shoes for him, and told them to enter a bedroom to find them. The Government contends that a trooper retrieved Bass's shoes and, while doing so, saw some counterfeit identification in plain view.

### 3.    Docket Entry Nos. 58 And 60

Bass filed two Motions to Suppress that challenge the search warrants that yielded evidence that the Government intends to present at trial, Docket Entry Nos. 58 and 60.

In his motion seeking to suppress evidence seized from the residence after the officers had obtained a warrant, Bass challenges the sufficiency of the affidavit supporting the search warrant.  (Docket Entry No. 58).

In response to Bass's motion challenging the sufficiency of the affidavit supporting the search warrant for the residence, the Government states that the officers did a brief security sweep after Bass opened the door.  It also contends that the officers entered a bedroom in the residence, with Bass's consent, so that they could obtain Bass's shoes.  The Government contends that, while doing so, a trooper familiar with identity theft observed, in plain view on a dresser, a credit card and a Michigan drivers license that appeared to be counterfeit.   The Government contends that the search warrant affidavit establishes probable cause.

In his motion seeking to suppress evidence seized from his cell phone after the officers had obtained a warrant for that (Docket Entry No. 60), Bass challenges the sufficiency of the affidavit supporting the search warrant.

In response to Bass's motion challenging the sufficiency of the affidavit supporting the search warrant for the cell phone, the Government contends that it does set forth probable cause to believe that Gerald Bass's cell phone was itself the instrumentality of the crimes of credit fraud, wire fraud, and conspiracy to commit wire fraud.

With the issues having been so framed by the parties, the Court held an evidentiary hearing on May 2, 2012.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard and observed the witnesses who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

Agent Scott Klein is a United States Secret Service Special Agent assigned to the Detroit Field Office. He is currently assigned to the identity theft task force division.

Trooper Andrew Osborne is a trooper with the Michigan Department of State Police, who is currently assigned to the Michigan State Police anti-theft task force.

Trooper Andrea Barber is also a trooper with the Michigan Department of State Police who is assigned to the anti-theft task force.

This action was initiated by way of a criminal complaint that was filed on November 2, 2011. On that same day, arrest warrants were issued authorizing the arrest of the four defendants in this case, including Berry and Bass.

After Trooper Osborne obtained the warrants, he and Agent Klein met at the task force office and drove to Berry's residence on St. Mary Street in Detroit, Michigan to arrest Berry. The two officers went to the front door of the residence and knocked on the door. A man and a woman answered the door. The officers identified themselves as police officers and stated that they needed to speak with Berry. The officers waited on the front porch, while the man and woman went to get Berry.

---

[1]To the extent that a finding of fact is more properly a conclusion of law, and the to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

Approximately a minute later, Berry appeared at the door and came out of the residence. When he came out of the house, Berry was holding a cell phone in his hand. The officers identified themselves as police officers to Berry and told him they were there to arrest him. Berry was cooperative with the officers. The officers led Berry to their patrol car. Agent Klein conducted a pat down search but the only items that Berry had on his person were the cell phone, a phone number written on a piece of paper, and some loose change in one of his pockets. Berry sat his cell phone on top of the car, and put his hands behind his back so that the officers could place handcuffs on him.

As the officers were en route to Bass's residence to arrest him, Berry told the officers that he needed medication that was at his residence. The officers returned to Berry's residence and Trooper Osborne knocked on the door. The man who answered the door at the residence, Mr. Fox, escorted Trooper Osborne upstairs to get Berry's medication. No evidence was seized when Trooper Osborne entered Berry's residence.

Trooper Osborne and Agent Klein then got back in their car and proceeded to Bass's residence at 12611 Ilene Street in Detroit, Michigan. While en route, they called some additional officers on the task force for support, including Trooper Barber and Inspector Jackson. Another officer who arrived at Ilene Street, Inspector Jackson, kept an eye on Berry in the patrol car as Trooper Osborne and Agent Klein proceeded to the front door of the residence.

The officers knocked on the front door to the residence and could hear loud music coming from the residence. Approximately a minute after they had knocked, Bass came and opened up the interior front door to the residence. Bass did not open the metal security door on the exterior of the front door. The officers and Bass could see each other through the metal bars

of the security door. Agent Klein had a marked Secret Service vest on and Trooper Osborne had a Michigan State Police ball cap on. Agent Klein showed Bass his badge and credentials.

The officers told Bass that they had a warrant for his arrest. When told this, Bass smiled and laughed and looked away from the officers. Bass did not open the door and appeared to be stalling. During this time, Bass had a cell phone in his hand and was texting or entering something into the cell phone. Agent Klein and Trooper Osborne both smelled a strong odor of burnt marijuana coming from the residence through the open door.

After approximately two to five minutes of Bass not opening the security door, Agent Klein told Bass that the officers were going to get a ram from their vehicle and take the door off its hinges. Bass then unlocked the security door. Agent Klein grabbed onto Bass and Bass stepped outside of the residence. Bass still had the cell phone in his hand when he stepped out of the residence. Agent Klein then handcuffed Bass. Bass not yet been advised of his *Miranda* rights at this time. Trooper Osborne asked Bass about the smell of marijuana coming from the residence. Bass responded that "he had less than a dime in the house."

Agent Klein walked Bass down to the patrol car and handed Bass off to Postal Inspector Jackson, who placed Bass in the back of the patrol car. Bass told the officers he wanted his lawyer. At this time, Bass was wearing a tank top and shorts and no shoes.

After handing Bass off to Postal Inspector Jackson, Agent Klein and Trooper Osborne entered the residence to do a protective sweep, in order to look for any persons who might be a threat to the officers' safety or destroying evidence. During the protective sweep, the agents found a man named David Reams in an upstairs bedroom listening to music on a computer. Reams also had his baby daughter with him. The officers allowed Reams and his daughter to

leave the residence.  No weapons, marijuana, or additional persons, were found during the protective sweep of the residence.

Prior to transporting Bass to the Detroit Field Office, Bass said that he needed his shoes. The protective sweep had already concluded by this time.  Agent Klein asked if they could enter the house to get his shoes and Bass said yes.  Agent Klein then asked Bass again if Trooper Barber, who was present with them, could enter the residence to get his shoes and Bass said yes. Bass then told Trooper Barber that she could find his shoes in his bedroom closet, and that his bedroom was a pink bedroom on the main floor of the residence.

Trooper Barber entered the residence and proceeded to the pink bedroom.  While proceeding to the closet in the pink bedroom, Trooper Barber saw a drivers license and a credit card laying on top of a dresser.  Trooper Barber then picked up those items and, upon looking closely at them, concluded that they may be counterfeit.  She concluded that the Michigan drivers license may be counterfeit because it did not have a hologram and because it was not Bass's name or picture on the drivers license.  Both the drivers license and the credit card were in the name of Robert S. Thompson.  The picture on the drivers license was not Bass.  Trooper Barber concluded the credit card may be counterfeit because, when she looked at it closely, it looked like the numbers had been rubbed off or scrubbed off of the card.

Trooper Barber took the drivers license and credit card, along with Bass's boots, and proceeded to the living room.  Although the protective sweep had concluded, Trooper Osborne was still in the living room.  Trooper Barber handed the drivers license and credit card to Trooper Osborne and then she took the boots to Bass.

After being handed the license and credit card, Trooper Osborne looked at them.  As to

the license, he noticed that it did not have the State of Michigan hologram seal that Michigan driver's licenses have as a security feature. As to the credit card, he concluded that the credit card numbers had been altered. He testified that if you turn the credit card on its side, or hold it up to the light in the right manner, you can see where the area where the numbers appear is not as glossy as the rest of the card.

Trooper Osborne then called his state police dispatch and asked them to run the name that appeared on the credit card and license, Robert S. Thompson. Dispatch informed Osborne that Robert S. Thompson was supposed to be a white or Caucasian male, but the license had the picture of an African-American male on it, and other inconsistencies.

Trooper Osborne left the credit card and license on the living room table in the residence and the officers closed the residence.

Agent Klein then transported Bass and Berry to the Detroit Field Office in the McNamara Building. At that point, the officers divided their duties. Agent Klein took over the processing of Bass and Berry, while Trooper Osborne began preparing a search warrant application for the residence in order to search for marijuana and the suspected fraudulent documents.

At the Field Office, Bass and Berry were put into separate interview rooms. Once Bass was placed in an interview room, Agent Klein advised Bass of his *Miranda* rights. This is the first time that Bass was advised of his *Miranda* rights. After having been advised of his rights, Bass consented to speak to the officers and signed a written consent form.

Meanwhile, Trooper Osborne obtained a search warrant for the residence on Ilene Street. (Docket Entry No. 58-2).

Later, the officers returned to the residence with the search warrant, at which time the

officers seized the credit card and the drivers license, along with other evidence.

## CONCLUSIONS OF LAW

At the conclusion of the evidentiary hearing, Counsel for Defendants advised the Court as to their positions, based on the evidence presented to the Court.

Defendant Berry's Counsel advised that Berry seeks to suppress the cell phone that was seized from him on November 2, 2011, on the basis that the cell phone was not in his possession at the time of his arrest.

Defendant Bass's Counsel advised that Bass seeks to suppress Bass's statement that "there's less than a dime" in the residence, and evidence that was seized from the residence after the officers obtained a search warrant, including the drivers license (Hearing Exhibit No. 2) and the credit card (Hearing Exhibit No. 1).

Bass contends that his verbal statement regarding to there being "less than a dime in the house" should be suppressed because the statement was a response to custodial interrogation before he was advised of his *Miranda* rights.

Bass contends that the drivers license and credit card were not searched or seized pursuant to the plain view exception to the warrant requirement and were thus illegally obtained. He further contends that such tainted evidence could not be used to establish probable cause for a search warrant.[2]

Having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following conclusions of law.

---

[2]Bass appears to have abandoned his challenge to the search warrant affidavit that authorized the search of his cell phone. Even if he had not, the Court would deny that motion because that search warrant affidavit was sufficient to establish probable cause and, alternatively, the *Leon* good faith exception would apply.

1.      **Berry's Cell Phone Was Properly Seized As Incident To His Arrest**.

Berry acknowledges in his brief that it is "without question" that an officer may seize items on the person, or in close proximity of a person they have arrested." (Def.'s Br. at 3) (citations omitted). Berry asks the Court to suppress the cell phone that was seized from him on November 2, 2011, on the basis that the cell phone was *not* actually in his possession at the time of his arrest. (*See* Hrg. Tr. at 78).

The facts established at the evidentiary hearing, however, show otherwise. Trooper Osborne testified that when Berry was arrested on November 2, 2011, Berry had the cell phone at issue in his hand. (*See* Hrg. Tr. at 42). This Court fully credits that testimony.

The Court shall deny Berry's motion seeking to suppress the cell phone. Once a lawful arrest has been made, the police officer is permitted to search the individual. *United States v. Campbell*, 486 F.3s 949, 955 (6th Cir. 2007); *see also United States v. Murphy,* 552 F.3d 405, 410 (4th Cir. 2009) (affirming district court's ruling that cell phone was seized lawfully during a search incident to arrest); *United States v. Fuentes*, 368 Fed. App'x 95, 98 (11th Cir. 2010) (Cell phone was seized in a proper search incident to the defendant's arrest). Thus, Berry's cell phone was properly seized as incident to his arrest. The Court shall therefore deny Berry's Motion to Suppress (Docket Entry No. 53).

2.      **The Statement Made By Bass, In Response To Custodial Interrogation Before He Was Advised Of His *Miranda* Rights, Must Be Suppressed.**

"The Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966) that a suspect subject to custodial interrogation must first be given notice of his or her right against self-incrimination. Statements obtained during custodial interrogation in violation of *Miranda* may not be admitted for certain purposes in a criminal

trial." *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003). In determining whether a defendant was subject to custodial interrogation, the "ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Knox*, 839 F.4d 285, 291 (6th Cir. 1988).

Here, Bass had been arrested and handcuffed, but had not yet been read his *Miranda* rights, when Trooper Osborne asked Bass about the smell of marijuana coming from the residence. Accordingly, Bass's response that "he had less than a dime in the house" must be suppressed.

### 3. The Officers' Initial Warrantless Entry Into The Ilene Street Residence To Conduct A Protective Sweep Was Justified.

The initial warrantless entry to conduct a protective sweep was justified. Moreover, it is undisputed that no evidence was seized during the protective sweep and no statements in subsequent search warrant affidavits were based upon observations during the protective sweep.

### 4. Bass Gave Trooper Barber Limited Consent To Enter The Residence In Order To Search For And Obtain His Shoes.

"Consent from an individual whose property is to be searched or from a third party who possesses common authority over the premises validates a search that would otherwise be considered unreasonable and unconstitutional." *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 547 (6th Cir. 2003) (Citations omitted). Even where a search is authorized by consent, however, the scope of the search is limited by the terms of its authorization. *Id.*

Here, Bass gave Trooper Barber limited consent to enter the residence in order to search for and obtain his shoes from his bedroom closet. Bass did not give Trooper Barber general consent to search his residence.

**5.      The Plain View Doctrine Does Not Apply**.

The Government contends that although Trooper Barber had limited consent to enter the residence, her temporary seizure of the drivers license and credit card at issue were permissible under the plain view exception to the warrant requirement.  The Court disagrees.

The Supreme Court has held that under certain circumstances the police may seize evidence in plain view without a warrant.  *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002) (citations omitted).  "To invoke the plain view doctrine, evidence must be '(1) in plain view; (2) of a character that is immediately incriminating; (3) viewed by an officer lawfully located in a place from where the object can be seen; and (4) seized by an officer who has a lawful right of access to the object itself.'"  *Shamaeizadeh v. Cunigan*, 338 F.3d 535 at 549 (Citing *United States v. Roark*, 36 F.3d 14, 18 (6th Cir. 1994)).

At issue here is whether the evidence at issue, the drivers license and credit card, were "of a character that is immediately incriminating."  As the Sixth Circuit has explained, that requirement "limits the use of the 'plain view' exception in two important ways.  Requiring that evidence be 'immediate' and 'apparent' constrains the expansion of the limited search authorized by a warrant into a generalized search, and it prevents officers from having an opportunity to create a reason to expand the search."  *McLevain*, 310 F.3d at 440.

In considering whether the criminality of a piece of evidence is  "immediately apparent," courts should consider the following factors: 1) whether there is a nexus between the seized object and the items particularized in the search warrant; 2) whether the "intrinsic nature" or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and 3) whether "the executing officers can *at the time* of discovery of the object on the

facts then available to them determine probable cause of the object's incriminating nature."
*McLevain*, 310 F.3d at 441 (quoting *United States v. Beal*, 810 F.2d 574, 576-77 (6th Cir. 1987))
(emphasis in original).

Consideration of these factors, leads this Court to conclude that the criminality of the
drivers license and credit card at issue was not immediately apparent.

First, this Court considers whether there is a nexus between the object seized and the
items particularized in the search warrant. Here, however, Trooper Barber was not in the
residence pursuant to any search warrant. Rather, Trooper Barber was in the residence because
Bass gave her limited consent to search for and obtain his shoes from his bedroom closet. There
is no nexus between the object that was the focus of the limited search Bass consented to (Bass's
shoes) and the drivers license and credit card that were seized.

Second, this Court considers whether the "intrinsic nature" or appearance of the seized
objects (the drivers license and the credit card) gives probable cause to believe that they are
associated with criminal activity. The facts in *McLevain*, and other cases discussed in that case,
provide guidance as to this factor.

In *Arizona v. Hicks*, the police entered an apartment to search for a shooter. *Arizona v.
Hicks*, 480 U.S. 321, 323 (1987). While inside the apartment, an officer saw stereo equipment
that he thought was incongruous in the otherwise poorly furnished apartment. *Id.* Suspecting
that the stereo may be stolen, the officer moved the equipment in order to read the serial tracking
numbers. *Id.* "The Supreme Court found that 'taking action, unrelated to the objectives of the
authorized intrusion, which exposed to view concealed portions of the apartment or its contents,
did produce a new invasion of respondent's privacy unjustified by the exigent circumstance that

validated the entry.'" *McLevain*, 310 F.3d at 441 (quoting *Hicks, supra*, at 325). "There was nothing about the 'intrinsic nature' of the stereo equipment that proclaimed it as contraband." *McLevain, supra*, at 441.

In *McLevain*, the officers had a search warrant that allowed them to search the defendant's home for an escaped fugitive, who was known to be friend of the defendant's. When executing the search warrant, an officer with narcotics training saw a twist tie and cut cigarette filter under a bed. *McLevain,* 310 F.3d at 438. Later in the search, another officer saw a spoon with residue on a tackle box in a sink in the garage. The officer conducted a field test on the residue, and found it to be residue of methamphetamine. At about the same time, the officer "noticed on the mantel of the fireplace in the garage a prescription bottle, with no label, filled with a clear liquid that looked like water. The officer later identified these four items as drug paraphernalia, and he used them to establish probable cause in seeking a second warrant. Upon returning with the second warrant, the officers discovered" eighty-five grams of methamphetamine and other evidence that formed the basis for drug charges against the defendant. *Id*.

The Sixth Circuit concluded that the evidence at issue did not immediately appear to be contraband. It noted that the items found in the defendant's home might be found in many homes, and "not exclusively in homes where methamphetamine is being used." *Id.* at 442. It also noted that while some of the items "might be out of the ordinary, the police are not authorized to seize odd items. We do not care what the explanation is for the items, but we care that there may be some other explanation for the items." *Id.* The court noted that the officers' experiences as law enforcement agents led them to believe the items were actually drug

paraphernalia. It explained, however, that "[t]he connection between these items and illegal activities" is "not enough to render these items intrinsically incriminating. The connection is not enough to make their intrinsic nature such that their mere appearance gives rise to an association with criminal activity." *Id*. at 442.

The evidence at issue here is a single Michigan's drivers license and a single credit card that are both in the name of Robert S. Thompson. Like the evidence at issue in *Hicks* and *McLevain*, there is nothing intrinsically incriminating about this evidence. Drivers licenses and credit cards are very common items that are found in many, if not most, homes. Drivers licenses and credit cards are not items found exclusively in homes where identity theft is occurring. The Government argues that the officers were reasonably suspicious about these items being counterfeit because, although these items were found in Bass's residence, Bass's name was not on these items and it was not Bass in the picture on the drivers license. The fact that the license and credit card were in the name of a person other than Bass, but found in his residence, does not render these items intrinsically incriminating. There could be multiple explanations for why such items could be in his residence. For example, those items could belong to a roommate, significant other, or family member who also lives in the residence. Accordingly, the Court concludes that the evidence at issue is not intrinsically incriminating.

Third, this Court considers whether Trooper Barber could, at the time of discovery of the objects on the facts then available, determine probable cause of the objects' incriminating nature. As to this factor, the Sixth Circuit has held that "when an item appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity, the item is not immediately incriminating." *McLevain*, 310 F.3d at 443 (citing *United*

*States v. Bryd*, 211 F.3d 1270, 2000 WL 4911511 *3 (6th Cir. 2000)).

Consideration of this third factor also leads this Court to conclude that the criminality of the drivers license and credit card at issue was not immediately apparent. Before seizing the items and further investigating, Trooper Barber merely observed a drivers license and credit card that did not belong to Bass laying on top of a dresser in Bass's bedroom. Thus, *at the time of discovery*, Trooper Barber could not determine if the drivers license and credit card were evidence of criminal activity.

Trooper Barber's knowledge of the investigation surrounding Bass made her suspicious when she observed that drivers license and credit card in Bass's bedroom. But Trooper Barber had to pick those items up, manipulate them and inspect them closely, in order to see that the drivers license did not have the hologram that Michigan drivers licenses have as a security feature and that the credit card numbers appeared to have been rubbed off. She then took those items to Trooper Osborne, who also had to manipulate and closely inspect them in order to observe that the hologram was lacking and that the area of the credit card where the numbers appear is less glossy than the rest of the credit card. Trooper Osborne then had to call state police dispatch and have them run the name appearing on the credit card and drivers license to learn that the picture on the drivers license was not consistent with the race of the actual person who held a Michigan drivers license under the name Robert S. Thompson. Where, as here, items appear "suspicious to an officer but further investigation is required to establish probable cause" as to their association with criminal activity, the items are not immediately incriminating. *McLevain*, 310 F.3d at 443.

Accordingly, the search and temporary seizure of the drivers license and credit card was

not justified by the plain view exception.

**6.   When The Tainted Information Is Excised From The Search Warrant Affidavit, There Is Still Probable Cause To Believe That Marijuana Would Be Found At The Residence.**

The facts set forth in Trooper Osborne's search warrant affidavit (Docket Entry No. 58-2)

are as follows:

1.      D/Trooper Andrew Osborne has over 12 years experience with the Michigan State Police, and is currently assigned to the Criminal Investigations Division, Identity Theft Team.  D/Trooper Osborne has experience and training in the investigation of criminal activity, including identity theft.

3.[3]    Further, affiant is conducting an identity theft investigation. On todays date 11/2/11, Investigators from the Michigan State Police Identity Theft team made contact at 12611 Ilene Street.  The purpose of the contact was to effect a Felony Federal Warrant arrest for Gerald Bass.

4.      Further, affiant made contact at the residence and knocked on the front door of the residence.  The interior door was opened by Gerald Bass (I recognized GERALD BASS from previously observed photographs).

5.      Further, affiant and Special Agent Scott Klein with the Secret Service both displayed our badges and credentials through the window of the armor guarded security door and advised that we had a Federal arrest warrant for him.  Bass began to laugh and would not initially open the door and started to sent text messages or dial numbers on his phone.  While standing there we observed the burnt odor of marijuana.

6.      Further, affiant has previously worked narcotics investigations and made numerous traffic stops where narcotics have been present.  I am familiar with the odor of burnt marijuana.

7.      Further, after being notified that the house would be entered with force to effect the felony arrest, Gerald Bass opened the secondary door and was arrested.  He was subsequently checked for any contraband with only his cell phone being located on his person.

---

[3]There are some errors with respect to the numbering of the paragraphs in the Search Warrant Affidavit.

8. Further, Bass informed the affiant that he was only smoking a blunt and had less than a dime in the house. The affiant is familiar that the term dime commonly refers to a small bag of marijuana and blunt refers to a marijuana cigarette.

Further, affiant believes that 12611 Ilene is the residence for Gerald Bass based on contact with the U.S. Probation department where Bass listed his address as 12611 Ilene. Bass further lists 12611 Ilene as his residence on his State of Michigan issued Drivers license.

9. Further, Affiant was informed by Bass that his nephew David and Davids infant daughter were upstairs. Affiant went upstairs and brought David and an infant girl downstairs. David was verbally identified as David Ream.

10. Further, Affiant was requested by Bass to retrieve his shoes for him from his mainfloor bedroom. Bass verbally gave permission to go into his bedroom on the mainfloor and retrieve a pair of shoes. Bass further identified that Bass's room was known as the pink room and was on the main floor of the residence.

11. Further, Detective Trooper Barber (who is also assigned to the identity theft task force and is familiar with identity theft, counterfeit identifications and counterfeit credit cards) went into the room to retrieve some foot ware for Bass.

10. Further, Detective Barber went into the room and immediately motioned for myself to enter. Det. Barber observed what she believed to be a counterfeit State of Michigan Drivers license and counterfeit credit card sitting in plain view on the dresser. The credit card had scrape markings indicating that old printed numbers had been rubbed off and new raised numbers had been added. Further the drivers license appeared to be lacking the state of Michigan hologram / seal. The name on the suspected fraudulent credit card and identification matched (Robert Stanley Thompson)

11. Further, Affiant observed the same aforementioned features and call [sic] Metro Dispatch to run the named listed on the license. The name Robert Stanley Thompson with a date of birth of 07/08/39 was run. Dispatch returned advising that Robert Thompson was supposed to be white male with blue eyes. This identification had the picture of an unknown African American male on it. Based on my training and experience in conducting identity theft investigations, I believed these items to be counterfeit.

Further, affiant is requesting this search warrant to seize the aforementioned suspected counterfeit identification and credit card and to search for further items associated with the crime of identity theft as outlined in the above listed items to search for. Also based on the observations of the odor of suspected burnt marijuana and the admission by Bass of marijuana in the residence the affiant believes that these items will be located as well.

12.　　Further, Affiant sayeth not.

(Search Warrant Affidavit, Docket Entry No. 58-2).  The majority of this information, however, is tainted because it was obtained: 1) as a result of custodial interrogation before Bass was advised of his *Miranda Rights*; or 2) during the previously discussed illegal search and seizure of the drivers license and credit card.

"[E]vidence discovered pursuant to a warrant will be inadmissible if the warrant was secured from a judicial officer through the use of illegally acquired information." *United States v. Oakley*, 944 F.2d 384, 386 (7th Cir. 1991) (citing *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 391-92 (1920)).  "Nevertheless, a search warrant which is procured only in part on the basis of tainted evidence is not necessarily invalid." *Oakley,* 944 F.2d at 386.  Instead, the court reviews whether the untainted information, considered by itself, establishes probable cause for the warrant to issue. *Id.*; *United States v. Hammond*, 351 F.3d 765, 771 (6th Cir. 2003); *United States v. Tatman*, 397 Fed. App'x 152, 169 (6th Cir. 2010).

Thus, the critical question to be determined is whether the above affidavit, apart from the tainted information that was illegally obtained, provides the requisite probable cause to sustain a search warrant. *Hammond,* 351 F.3d at 771.

When the tainted information is excised from the search warrant affidavit, the following pieces of information remain: 1)  Trooper Osborne has over 12 years experience with the

Michigan State Police; 2) Trooper Osborne has previously worked narcotics investigations and is familiar with the odor of burnt marijuana; 3) on November 2, 2011, Trooper Osborne was at the residence to arrest Bass; and 4) when doing so, Trooper Osborne smelled the odor of burnt marijuana when Bass opened the door.

Looking to the four corners of the excised affidavit, the Court concludes that it was sufficient to establish probable cause to search Bass's residence for marijuana. That is, if the information regarding the credit card and drivers license, and Bass's statement regarding there being "less than a dime in the house," are excised from the search warrant affidavit, there was still sufficient evidence to merit the issuance of a warrant because there was probable cause to conclude that marijuana was present.

However, the excised affidavit was clearly not sufficient to establish probable cause to search Bass's residence for a counterfeit identification and credit card or further items associated with the crime of identity theft.

**7.      The Inevitable Discovery Exception Does Not Apply.**

The Government contends that, even if this Court "were to conclude that the discovery of the counterfeit driver license and credit card did not come within the plain view exception to the warrant requirement, nonetheless, they would have been inevitably discovered when the search warrant for marijuana and other controlled substances was executed." (*See* Docket Entry No. 76, Govt.'s Suppl. Br. at 7-8).

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendments, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497

(6th Cir. 1995) (citation omitted).  "The inevitable discovery doctrine, an exception to the exclusionary rule, allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means."  *Kennedy*, 61 F.3d at 497 (citation omitted).

For the inevitable discovery doctrine to apply, "it must be demonstrated that the evidence inevitably would have been acquired through lawful means had the government misconduct not occurred."  *Id*.  "Proof of inevitable discovery 'involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings."  *Id*. (citation omitted).  With these principles in mind, the Court turns to the Government's argument.

The Government contends that "[a]gents who were authorized to search for marijuana would have been authorized to search in any location where marijuana could be secreted: drawers, desks, dressers, closets, under beds, in clothes, in every room of the house.  The counterfeit credit card and driver license would certainly have been recognized and seized at that time, and so would the 120-plus photocopies of the covers of unwitting victims' medical files, containing all their most private identifying information."  (Docket Entry No. 76, Govt.'s Suppl. Br. at 7-8).

As to the drivers license and credit card, the Court disagrees that those items would have been recognized and properly seized during the execution of a search warrant authorizing the officers to search for marijuana.  Clearly, the officers could seize illegal contraband, that was not specified in the search warrant, if they observed such contraband in plain view during the execution of a valid search warrant.  However, for the same reasons that the Court found that

those items were not subject to the plain view exception to the warrant requirement when the officers searched and seized those items when Bass gave them limited consent to search for his shoes, that exception would not apply when the officers returned with a warrant limited to marijuana.

As to the "120-plus photocopies of the covers of unwitting victims' medical files", the Government has presented no evidence whatsoever as to the nature of those files, or any facts surrounding the discovery of those files. As such, the Government has not met its burden of establishing that such evidence is saved by virtue of the inevitable discovery doctrine.

Accordingly, the Court shall suppress the credit card, the drivers license, and certain other evidence that was seized during the search.

### CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant Berry's Motion to Suppress (Docket Entry 53 is DENIED).

IT IS ORDERED that Defendant Bass's Motions to Suppress (Docket Entry Nos. 54, 58, 60 & 61) are GRANTED IN PART AND DENIED IN PART. The Motions are GRANTED to the extent that the Court hereby SUPPRESSES the following evidence: 1) Bass's statement to the police that he had "less than a dime in the house"; and 2) the credit card (Hrg. Ex. No. 1), the drivers license (Hrg. Ex. No. 2), and the other items listed on Pages 2 through 9 on the Supplemental Incident Report 0005 (*see* Docket Entry No. 78, Joint Response to Court's 5/17/12 Order), with the exception of weapons and ammunition, that were seized during the execution of the search warrant on Ilene Street in Detroit, Michigan on November 2, 2011.

IT IS ORDERED that Defendant Bass's Motions to Suppress are DENIED IN ALL

OTHER RESPECTS.

     IT IS SO ORDERED.

                           S/Sean F. Cox
                           Sean F. Cox
                           United States District Judge

Dated:  May 29, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 29, 2012, by electronic and/or ordinary mail.

                           S/Jennifer Hernandez
                           Case Manager